UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

ADELAIDE CORNELL,

        PLAINTIFF,

  VS.                                        05-1389

RAY GUBBLES and ANDREW GROVE,

        DEFENDANTS.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

This case was tried to the court on March 2, 2009.[1] The plaintiff, Adelaide Cornell, appeared personally accompanied by her counsel, Geoffrey J. Repo, Esq. and Scott Mascianica, Esq. The defendants, Ray Gubbles and Andrew Grove, appeared personally accompanied by their counsel, Jacob H. Smith and Christopher Higgerson, Illinois Assistant Attorneys General. This is a case brought under the provisions of 42 U.S.C. §1983 claiming money damages. The court has jurisdiction under the provisions of 28 U.S.C. §§ 1331 & 1343. The uncontested facts of the case are set out in the appendix attached to this order.

The plaintiff, Cornell, is a former inmate of the Illinois Department of Corrections who, at the time of the occurrences complained of in this case, was housed in the segregation unit of the Dwight Correctional Center. The defendant, Ray Gubbles, was a correctional sergeant[2] acting as a supervisor on the wing where the plaintiff was housed. The defendant, Andrew Grove, was a correctional officer working as a wing officer on the same shift as Defendant Gubbles. Correctional Officer Tammy Bentley was also a wing officer on this same shift.

Cornell claims that on July 9, 2004, Gubbles read one of her personal letters over the prison intercom system infringing her First and Fourth Amendment rights. Cornell maintains that she tried to stop Gubbles by first threatening to flood her cell and then threatening to report him to Internal Affairs. The plaintiff claims that Gubbles came to her

---

[1] It was finally fully briefed and submitted for decision on July 6, 2009.

[2] He is now a correctional lieutenant.

1

cell and physically attacked and hurt her in violation of the Eighth Amendment and state law.  The plaintiff claims that Grove stood by during the attack and did nothing to intervene.  Cornell further claims she suffered from physical injury and severe emotional distress as a result of Gubbles' actions.  The defendants deny liability.  The evidence is conflicting and therefore the case tuns on the credibility of the witnesses.

I.

The segregation unit where the plaintiff was housed is constructed around a central control room called a panel, with four pods or corridors of cells radiating outwards from the control panel. (Plain. Ex. 3).  The panel and corridors are arranged so that the officer on duty in the panel can see down each of the four corridors of cells.  At the time in question, the officer on duty in the panel was Correctional Officer Barbara Hoffmeyer.  The panel officer's position is a stationary one, while the other officers on duty move about the unit.  The panel has controls for locking and unlocking the cells in the unit.  It is equipped with a communication system that permits the officer in the panel to speak with the inmates in an individual cell or to broadcast over a public address system to all the cells within the unit. The inmates are housed two to a cell.

At about 8:30 p.m. on the date of the incident, Cornell wrote two personal letters — one to her mother and one to her boyfriend.  In the letter to her mother, Cornell wrote about how she was getting along in prison, about her room mate, and about her need for money.  Cornell also enclosed coupons for magazine subscriptions for herself and her roommate.  In her letter to her boyfriend, Cornell wrote three pages of very specific and explicit descriptions about their sexual relations.  The letter contained no other information and had no enclosures.  Cornell put the letters in their unsealed envelopes and wrote the addressees' names on them and her own name and inmate serial number.  In accordance with mail procedures at Dwight Correctional Center, Cornell gave the letters to Correctional Officer Tammy Bentley when she came through the unit picking up outgoing mail.  Bentley took the mail to the panel and put it through the panel chuck hole.  She did not put it into the locked box for mail that is kept in the panel because the box was not within her reach. (Stip. Facts. No. 9, 10).

Shortly after Bentley delivered the mail to the panel, Gubbles entered the panel and Hoffmeyer took advantage of his presence in the panel to leave her post and go into the bathroom that is located inside the panel.  Hoffmeyer testified she couldn't hear what Gubbles was doing but heard muffled voices and thought he was reading something.  The court finds she was quite evasive in her recollections.  That might be due to the passage of time, but it also appeared to the court that she was deliberately slanting her testimony to favor Defendant Gubbles, her present superior officer. (Trial Tr. p. 76-78.)

2

Gubbles states that he noticed the mail sitting on the table in the panel and saw the magazine subscriptions sticking out of an envelope. Gubbles says he thought the plaintiff was attempting to mail the magazine subscriptions out for other inmates. Therefore, Gubbles says he got on the intercom system to determine if Cornell was responsible for the subscriptions.

What happened, the court finds from a consideration of all the evidence, was this: Gubbles proceeded to read all or parts of Cornell's sexually explicit letter to her boyfriend over the unit's public address system, or, as he claims, over the individual connection into Cornell's cell. Either way, both Cornell and Parks said it was audible to others on the wing. The court finds that this was a deliberate act on Gubbles' part to humiliate, punish and provoke Cornell. In addition, it was not Gubbles' function to check Cornell's mail for enclosures or contraband. That was the job of the mail room personnel who examined all inmates' outgoing mail. In his announcement over the intercom Gubbles first stated that it was "story time" prior to reading the letter. (Trial Tr. p. 41). Cornell became upset, hysterical, and screamed over the intercom at Gubbles to stop reading her letter. He laughed and kept right on reading. Cornell became increasingly agitated and hysterical.

Both sides agree that Cornell first threatened to flood her cell and then yelled that she was going to report Gubbles to Internal Affairs. Gubbles, fearing that Cornell would flood her cell and the gallery, ordered Bentley to shut off the water supply to Cornell's cell. Bentley went to the utility closet next to Cornell's cell but was unable to close the valve controlling the water supply. Grove was then called to assist, and he went to the utility closet and closed the supply valve. When Grove arrived at the utility closet to assist Bentley, Grove saw Gubbles outside Cornell's cell. While he was inside the utility closet working the control valve, Grove could hear Gubbles enter the cell. Grove also heard Gubbles tell Cornell to cuff up, Cornell yelling deprecatory remarks and scuffling sounds. When Grove came out of the utility closet and went to stand outside Cornell's cell, Gubbles had already handcuffed her and was assisting her up off the floor to sit on the bed.

The parties agree that Gubbles entered the plaintiff's cell without having the two inmates cuff up first. The court finds Cornell's consistent account about Gubbles' conduct the most credible. She states Gubbles entered her cell and they exchanged words. Then Gubbles grabbed Cornell by the arm, twisted it, hit her across the arm with the hand cuffs, threw her to the floor face down striking her head on the metal bed, kicked her in the breast, put his knee in her back, and put the hand cuffs on her.

Photographs of Cornell presented at trial are hard evidence of what took place. Taken just four days after the incident, the photographs reveal bruising that had to have been produced by trauma and are consistent with the time frame of the assault. They

demonstrate clearly that Gubbles used force on Cornell and injured her. The defendant offered no explanation for the bruising and in fact, changed his version of events at trial. Gubbles incredulously testified that there was no physical altercation of any kind with Cornell because she did not resist his efforts to handcuff her. The defendant had previously told the Internal Affairs investigator that Cornell pulled away as he put the handcuffs on one of Cornell's arms. (Trial Tr. p. 140). In addition, the report from the Employee Review Hearing based on Gubbles statements indicates that Gubbles said he tried to put the handcuffs on Cornell, but could not.

Gubbles testimony was further weakened by the fact that other witnesses testified that correctional officers, such as Gubbles, are required to write an incident report if there is any physical altercation with an inmate. No report was made in this case. In addition, Gubbles admitted that based on his version of events, he could have written several disciplinary infractions against the plaintiff, but did not.

The court also finds that the testimony of Major Kevin White was particularly enlightening as to what really took place. White was the lieutenant investigator for Internal Affairs at the institution. Prompted by Cornell's complaint about Gubbles, and at the direction of the warden, White undertook an interrogation of all the parties with knowledge of the incident. His report shows an interview with Cornell, Gubbles, Grove, Bentley, Hoffmeyer, Parks and other inmates assigned to the unit just days after the incident. The investigation concluded that the defendant had engaged in unprofessional conduct for reading the letter over the intercom. Gubbles admitted that he told the investigator that Cornell's letter was "juicy." (Trial Tr. p. 127). In addition, White found that the force used by Defendant Gubbles was unauthorized.

Plaintiff Cornell claims that during Gubbles assault, Defendant Grove was outside her cell, but said nothing and did nothing to intervene. The court does not believe this claim. Cornell's version of the events differs from Grove's as to the length of time he was outside her cell observing the incident with Gubbles. However, Defendant Grove's testimony corroborates the plaintiff's version of events to the extent that he heard Gubbles entering the cell, heard scuffling and yelling, and saw Gubbles was picking Cornell up off the floor to sit her on the bed.

II.

"[I]t is well established that prisons have sound reasons for reading the outgoing mail of their inmates." *United States v Whalen,* 940 F.2d 1027, 1035 (7th Cir.

1991).  However, those sound reasons are based on the "exercise of legitimate government interests."*Id.*  Since the court finds that Defendant Gubbles explanation for publicly reading the plaintiff's letter is not credible, the defendant has put forth no legitimate penological reason for his actions.   The court finds that Defendant Gubbles decision to read portions of the plaintiff's private letter over the prison intercom was a deliberate act to humiliate, punish and provoke Cornell and nothing more.

It is transparent to the court, and the court finds, that the correctional officer witnesses slanted their testimony to shield Gubbles from responsibility for his conduct. He acted deliberately to punish Cornell by subjecting her to humiliation and scorn from everyone within the sound of his voice.  And then to add to that insult and the violation of what remains of an inmate's freedom from unreasonable seizures and the right of communication, he used excessive and uncalled for force against her and inflicted physical injury upon her.

Grove, the court finds, had no authority to intervene against a superior officer and did not personally observe the use of force by Gubbles.   Instead, Grove only arrived at the front of the cell when the confrontation had already taken place.

Finally, the court finds that Cornell has failed to  demonstrate that Gubbles committed the state law tort of intentional infliction of emotional distress.   She testified that she felt depressed immediately after the events and still fears Gubbles.  However, showing that the plaintiff suffered emotional distress is not enough.   The stress must be so severe that a reasonable person could not be expected to endure it. *Kleidon v Chevrolet,* 527 N.E.2d 374, 377 (1988).  "Although fright, horror, grief, shame, humiliation, worry, etc., may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable."  *Id.*  The plaintiff presented no other evidence of severe emotional impact after the events of July 9, 2004.   The evidence presented at trial simply does not rise to the level of intentional infliction of emotional distress.

Therefore, the court finds by a preponderance of the evidence that Defendant Gubbles infringed the plaintiff's First, Fourth and Eighth Amendment rights and committed the state law offense of battery.  The court further finds that Defendant Groves did not violate the Eighth Amendment, and Defendant Gubbles did not commit the state law offense of intentional infliction of emotional distress.

### III.

The plaintiff has asked for compensatory damages in the amount of $25,000 for the Eighth Amendment violation, $25,000 for the violation of the First and Fourth Amendment rights, and $25,000 for the state law offense of battery.  The plaintiff further

requests $100,000 in punitive damages.

Quantifying the damage to the plaintiff in this case is difficult. Nonetheless, the Seventh Circuit requires district judges to provide an explanation with citations to comparable cases when awarding damages for pain and suffering or similar difficult-to-quantify categories of damages. *Jutzi-Johnson v United States,* 263 F.3d 753, 759 (7th Cir. 2001).

The court notes that intangible injuries such as pain and suffering, personal humiliation, mental distress and embarrassment are compensable injuries under §1983. *Freeman v. Franzen*, 695 F.2d 485, 493 (7th Cir.1982)(*citation omitted*).

> Compensation for such injuries must not be denied simply because it is not easily quantified. Conversely, such injuries cannot be presumed to flow from every deprivation of constitutional rights. Instead, plaintiff must prove the existence and magnitude of subjective injuries with "competent evidence." *Busche v. Burkee*, 649 F.2d 509, 519 (7th Cir.), citing *Carey v. Piphus*, 435 U.S. 247, 264 fn. 20(1978).

The plaintiff must show the nature and circumstances of the wrong and its effect on the plaintiff. *Carey,* 435 U.S. 263-64.

While the court finds that the evidence fails to show that Cornell has suffered severe emotional distress as a result of Gubbles actions, there is limited evidence of emotional pain and mental anguish. The plaintiff testified that she was crying, yelling and threatening the defendant in an attempt to get him to stop reading her very personal letter. Her roommate testified that after the incident, she heard the plaintiff crying at night. The plaintiff also testified that she had problems sleeping for awhile after the incident. There is no evidence of any mental health treatment or counseling after the incident even though the plaintiff was familiar with those services.

The evidence also shows the plaintiff suffered physical injuries as a result of Gubbles' physical attack. However, there is no evidence that Cornell suffered any out-of-pocket expenses as the result of her injuries. There is no record of any medical care other than a nurse's examination and any medical care that was provided would have been at the state's expense.

The court has first considered damages awarded in cases in which a prisoner was subjected to excessive force by a correctional officer. The most relevant obviously being cases involving relatively minor injures which required little or no medical attention. *Freeman v. Franzen*, 695 F.2d 485, 493-94 (7th Cir.1982)(jury awarded inmate

compensatory damages of $2,500 against one defendant and $250 each against two others; defendant prison guards "repeatedly punched and kicked Freeman in the back, face, and testicles" and plaintiff's "entire body hurt" though there was no permanent injury; the Seventh Circuit described the modest awards as "certainly not excessive"); *Edwards v Dwyer*, 2008 WL 4643946 (E.D. Mo Oct. 20, 2008)(guard scratches inmate with her fingernails on two occasions leaving permanent scaring. Court finds injury inflicted with malicious intent, awards $250.00 in actual damages and $250.00 in punitive damages); *Hynes v. LaBoy*, 887 F.Supp. 618, 626-27 (S.D.N.Y.1995) (upholding jury award of $1,250 of compensation for inmate who suffered two cuts and a black eye); *Davis v. Moss*, 841 F.Supp. 1193 (M.D.Ga.1994) (awarding $10,000 for pain and suffering only, where corrections officer shoved handcuffed inmate down a fire escape); *Edwards v. Kelly*, 1990 WL 106851 (S.D.N.Y. July 23, 1990) (awarding plaintiff who claimed he had been beaten by police officers in a late-night encounter $500, where the plaintiff was punched only once unlawfully, causing a cut lip and bruised jaw, with no permanent injuries and no visible injury just two days after the incident); *Williams v. Omodt*, 640 F.Supp. 120 (D.Minn.1986) (awarding compensatory damages of $5,000 where corrections officer hit and choked handcuffed inmate, causing bruising, contusions, swelling, and pain, but no permanent physical injury).

The court found no cases that would warrant the damage amount requested by the plaintiff in this case. The plaintiff in the case before the court suffered from bruising and some emotional distress. Therefore, the court will award $1,000.00 in compensatory damages based on Gubbles' violation of the Eighth Amendment and the state law battery claim.

There are very few cases to compare concerning Gubbles violation of the First and Fourth Amendments based on broadcasting the plaintiff's personal letter over the plaintiff's intercom system. Nonetheless, compensatory damages have been awarded for emotional distress resulting from the interference with an inmate's mail. *Parrish v Johnson,* 800 F.2d 600 (6th Cir. 1986)(case remanded for consideration of damages for pain, suffering and emotional distress after defendant capriciously refused to distribute plaintiff's mail and read legal and personal letters).

In *Jolivet v Deland*, 966 F.2d 573 (10th Cir. 1992), the court found a defendant was guilty of violating plaintiff's Fourth Amendment privacy rights when he made photocopies of three love letters and let another inmate read them. The court found that the plaintiff had provided enough evidence of the emotional distress he suffered to establish an actual injury, but because of the "sparse proof," only $250 was awarded in compensatory damages. *Id.* at 576. The appellate court stated that while it might have been inclined to award a greater amount, it could not say the damage amount was an abuse of discretion. *Id.* at 577. The district court also did not award punitive damages because the plaintiff did

not show the defendant acted with malice or knew his actions were unconstitutional. The letters were shown to the other inmate in an attempt to convince him to become an informant.

In the case before the court, the private, sexually-explicit love letters were "broadcast" over an intercom system. While there is conflicting testimony as to how many others may have heard the letter, the court believes other guards and inmates were able to hear at least portions of the letter. In addition, the defendant in this case has offered no legitimate reason for reading the private letter.

Therefore, the court will award $ 500.00 in compensatory damages for Gubbles' violation of the First and Fourth Amendment.

In addition, punitive damages may be assessed "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v Wade,* 461 U.S. 30, 56 (1983). The Seventh Circuit requires a showing of aggravating circumstances or malicious intent to justify an award of punitive damages. *Freeman,* 695 F.2d. at 490. In addition, punitive damages are awarded for the purpose of deterring or punishing constitutional violations. *Merritt v De Los Santos,* 721 F.2d 598, 601 (7th Cir. 1983).

The court finds that punitive damages in this case are appropriate. The defendant was a sergeant with experience and training. The court concludes the defendant was fully aware that reading the plaintiff's letter over the prison intercom was a violation of her constitutional rights. The defendant offered no credible reason for his actions and has a history of attempting to "rile" inmates for his own amusement.[3] The defendant abused his power over the plaintiff to punish her and to humiliate, embarrass and shame her. And finally, the defendant continued his abuse of power over the plaintiff when he used unjustified force against her. The plaintiff, a supervisor, chose not to follow prison procedures for handcuffing inmates before entering their cell and wrote no incident reports or disciplinary reports regarding the incident. His conduct was far more than unprofessional.

Therefore, the court will award $1,000.00 in punitive damages to the plaintiff and against the defendant, Gubbles.

The clerk is directed to enter judgment in favor of he plaintiff, Cornell, and against

---

[3]Trial Tr. p. 158, Groves testified that Gubbles would rile up inmates "[t]o see how we deal with it."

8

the defendant, Gubbles, in the sum of $2,500.00, together with costs of suit. The clerk is further directed to enter judgment in favor of the defendant Grove and against the plaintiff Cornell. In that claim, the parties shall bear their own costs.


**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

## APPENDIX

## STIPULATION OF UNCONTESTED FACTS AND ISSUES OF LAW

Pursuant to Local Rule 16.3 of the United States District Court for the Central District of Illinois, Plaintiff ADELAIDE CORNELL, and Defendants RAY GUBBLES and ANDREW GROVE, hereby submit the following Stipulation of Uncontested Facts and Issues of Law.

## UNCONTESTED FACTS

1. Plaintiff is four feet, eleven inches tall and weighed approximately one hundred and forty-four (144) pounds at the time of the assault.

2. Defendant Gubbles is approximately five feet, eleven inches tall, and weighed between two hundred and sixty (260) and three hundred (300) pounds at the time of the assault.

3. Plaintiff was incarcerated within the Illinois Department of Corrections facilities from September 2002 until March 2007.

4. Within the Illinois Department of Corrections, Plaintiff was housed at the Dwight Correctional Center from February 2003 until March 2007.

5. On July 9, 2004, Plaintiff was housed in the Segregation Unit of the Dwight Correctional Center.

6. The Segregation Unit is an isolation unit for individuals to be considered more aggressive or who have violated institutional rules.

7. Inmates in the Segregation Unit are subject to greater restrictions than inmates in the general population, including restrictions on contact visits, audio-visual privileges, commissary privileges and how they are restrained by correctional officers.

8. Inmates in the Segregation Unit have the same mail privileges afforded to those in the general population.


PLAINTIFF'S EXHIBIT 1

9. When an inmate send outs mail that is non-privileged, it is left unsealed by the inmate.

10. Defendant Bentley picked up Plaintiff's unsealed letters between 8:00 and 9:00 P.M. on the evening of July 9, 2004 to be placed in the outgoing mail.

11. Plaintiff and her cellmate, Sharita Parks, were in the Plaintiff's cell at the time and heard either the entire letter or part of the letter being read over the intercom by Defendant Gubbles.

12. As Defendant Gubbles read either the entire letter or part of Cornell's letter over the intercom, Plaintiff became extremely embarrassed and upset.

13. As a result of Defendant Gubbles reading her mail, Plaintiff became angry, threatened to flood her cell and threatened to report Gubbles to internal affairs for improper sexual contact with another female inmate.

14. Defendant Hoffmeyer, from inside the panel area, "popped" open the door to Plaintiff's wing. Defendant Gubbles opened Plaintiff's cell and Gubbles entered Plaintiff's cell.

15. Standard procedure in the Segregation Unit requires that inmates "cuff up," i.e., the inmate must be handcuffed from behind, before an officer enters an inmate's cell. However, certain circumstances such as medical emergencies, inmate fighting, or an inmate refusing to "cuff up" would prevent this procedure.

16. Entering into an inmate's cell without requiring them to "cuff up" is considered irregular.

17. Additionally, if more than one offender is present in the cell, both offenders must be handcuffed from behind. However, certain circumstances such as medical emergencies, inmate fighting, or an inmate refusing to "cuff up" would prevent this procedure.

18. Defendant Gubbles entered Plaintiff's cells without cuffing Plaintiff first.

19.  Defendant Gubbles did not cuff Plaintiff's cellmate upon entering Plaintiff's cell.

20.  Following the incident, Defendant Gubbles did not report his use of force with a DC 434 incident form. Defendant Gubbles also did not notify his shift commander about the incident.

21.  Plaintiff showed Defendant Bentley her red and irritated arm during Defendant Bentley's next round check.

22.  The Illinois Administrative Code requires that medical screening and/or medical care must be administered to an inmate following the use of any force which results in bodily injury, including a cut or a bruise.

23.  Kimberly Krug, a registered nurse, examined the Plaintiff on July 13, 2004 and took photographs of the bruises on her body.

24.  The photographs taken by Kimberly Krug are marked as Plaintiff's Exhibit 23 on Plaintiff's Exhibit List.

25.  Dwight Correctional Center has a special unit called the Mental Health Unit ("MHU") for inmates suffering from depression and other mental health issues.

26.  Defendant Gubbles received specialized training in the area of "crisis intervention," as part of his training as a Sergeant.

27.  A "crisis intervention" requires Defendant Gubbles to meet and talk with inmates for the purpose of determining whether they need to be placed on suicide watch or need professional medical or psychiatric assistance.

28.  Prior to the incident in question, Defendant Gubbles had approximately 15-20 crisis interventions with Cornell, with each intervention lasting between 15-30 minutes.

29.  Prior to the incident in question, Defendant Grove was aware that Cornell had spent at least one month in MHU.